## ROSS v. FICKLING.

EVIDENCE; REAL ESTATE BROKERS; MUTUAL ACCOUNTS; STATUTE OF LIMITATIONS; APPELLATE PRACTICE; REMITTITUR.

1. Where real estate owners make a contract with a broker to pay him commissions on the sale of lots with building privileges, in which transactions no cash is paid by the purchasers, but the owners advance the money to make certain improvements, secure themselves by deed of trust on the property, and receive from the purchasers a bond conditioned upon the purchasers so making the improvements, and a suit is brought by the broker to recover his commissions on a given transaction, testimony tending to show the insolvency of the purchasers is incompetent, where they did or were ready to give the necessary deed of trust and bond.

2. Where a mutual account exists between parties and the last item is barred by the statute of limitations, it is incompetent for one of the parties to remove the bar of the statute by entering subsequent items on his own side of the account.

3. If a broker having charge of the property of a syndicate makes a contract of sale of lots to a nominal purchaser, to show business, and such purchaser subsequently assigns to a *bona fide* purchaser, who completes the sale, the statute of limitations will run against the broker's claim for commission as of the date of the *bona fide* sale and not of the nominal one.

4. A judgment on verdict in an action of assumpsit *modified* upon condition of the entry in this and the lower court of a *remittitur* of a portion of the judgment, the portion held to be erroneous being readily separable from the balance.

No. 710. Submitted October 20, 1897. Decided November 16, 1897.

HEARING on an appeal by the defendants from a judgment

on verdict in an action of assumpsit by a real estate broker to recover commissions. *Modified and affirmed.*

The Court in its opinion stated the case as follows:

This is an action in assumpsit instituted by the appellee, . Charles H. Fickling, a real estate broker, to recover a balance alleged to be due to him for money advanced and services rendered in and about making sales and finding purchasers for certain parcels of land in a place known as "Cooke Park," in that part of the city of Washington formerly known as Georgetown. The declaration, filed on May 5, 1896, alleges that this property was owned by a syndicate or association consisting of the appellants, who, acting by and through the appellant Samuel Ross, as their manager, and the appellant Charles C. Duncanson as their treasurer, employed the appellee as their agent to make such sales and to find such purchasers. The pleas interposed by the defendants, the appellants here, were *non assumpsit*, payment, and the statute of limitations.

At the trial the plaintiff gave evidence tending to show that, in the year 1891, he had been employed by the Cooke Park syndicate, through Ross and Duncanson, to sell lands in the Park; that he was to have entire charge of making sales, and was to receive a commission of five per centum on the amount of sales for his compensation ; that the terms of sale were to be either all cash, or one-fourth cash and the residue on time specified ; or in the event of a purchaser agreeing to build upon the land, only a bond and deed of trust were required, without any cash, the syndicate agreeing to furnish the cash under the deed of trust for the purpose of the building; that, in the latter event, a sale with building privileges, as it was commonly called by the parties, the purchasers were to submit to the plaintiff plans and specifications for the proposed building, and a bond to be prepared by a title company, with the names of the bondsmen or sureties thereon, conditioned that the purchaser

would perform the contract; that these papers were thereupon to be submitted to the appellant Ross, and, if they were approved by him, the transaction would be closed.

The evidence on his behalf further tended to show that he sold a large number of lots for one-fourth cash and the residue in instalments; and that there were two sales, with the building privileges so-called, one of eighteen lots to a Mr. Simmons, and one of ten lots to C. J. and J. H. Handback. These transactions, or some of them, extended over the period between September 14, 1892, and March 16, 1893. At least, that is the period covered by such portion of them as is referred to in the plaintiff's bill of particulars filed with his declaration, in the shape of an itemized statement of account between himself and the defendants, which he testified to contain a correct statement of such account.

With reference to the statute of limitations, the testimony in the case, and the gist of the controversy, it seems to be proper to divide this statement of account into two, or perhaps three, parts. The first of these parts would end with March 16, 1893, on which day a payment of $300.50, if the figures are correct, was made to the plaintiff by Duncanson, treasurer, on general account, which item is the last credit to the defendants in the account, and which apparently then left due to the plaintiff the sum of $136.98.

The second part of the account includes two items of charge by the plaintiff against the defendants, aggregating $25 under dates of March 20, 1893, and April 1, 1893. These two parts of the account beyond question accrued more than three years before the institution of the suit, and are therefore barred by the statute of limitations, unless the whole account can be considered as one account with the element of mutuality running through it all, so as to make the running of the statute to begin from the date of the last item. Otherwise than by the interposition of the bar of the statute the items of these two parts do not seem to be controverted between the parties.

The main controversy is over what we designate as the third part of the account, containing three items of charge by the plaintiff against the defendants, under dates of April 1, April 17 and May 9, 1893, which refer to two transactions that are claimed to have extended themselves and to have been consummated within the period of limitations. These transactions, so far as they are elucidated by the testimony in the record, were these.

On September 14, 1892, the plaintiff sold, or contracted to sell, lot 116 in the Park to his brother, Jeremiah Fickling; and received from him a deposit of $100, the terms of the contract to be complied with within ninety days. This sale was approved on September 17, 1892, by Ross. On April 9, 1893, Jeremiah Fickling, who seems to have been merely an intermediary, and who was not the only one, it seems, interposed merely to get options and show briskness in sales, assigned his purchase to one Ballantine; and on May 9, 1893, the sale was closed with Ballantine by the syndicate. The question with regard to this is, whether the plaintiff was entitled to his commissions on the nominal and unconsummated sale of September 14, 1892, in which event it is claimed that the statute of limitations would apply, or whether his commissions really became due on the consummated sale to Ballantine on May 9, 1893, which would bring them within the period of limitation.

The second transaction is of an alleged sale by the plaintiff to the Handbacks of lots 57 to 63, both inclusive, with the building privileges; and most of the controversy has expended itself upon this transaction. In reference to it the plaintiff's testimony tended to show that, on November 20, 1892, the plaintiff, in pursuance of his employment by the defendants, as their agent, made a contract, approved by the defendant Ross, to sell to a second syndicate or association, known as Cooke Park Syndicate No. 2, of which the plaintiff himself was a member, seventeen lots, in the Park, in which were included the seven lots, Nos. 57 to

63, both inclusive, here in question; that this second syndicate, like Jeremiah Fickling in the other case, was only a party interposed for the purpose of making a real sale; that it was authorized by the contract to sell or resell the seventeen lots specified, with building privileges, within six months thereafter; that, upon such sale or resale, the defendants were to receive a certain amount specified in the contract, and syndicate No. 2 was to receive the difference between that amount and the price which the new and real purchasers would pay; that thereupon ten of the seventeen lots were sold, with the building privileges, to the Handbacks, already mentioned; that, in making the sale, the plaintiff acted for syndicate No. 2, and in the completion of the contracts for the defendants (syndicate No. 1); that the contract with the Handbacks was approved by the defendant Ross; that, in pursuance of it, the Handbacks entered upon its execution, and built houses on the ten lots; that, during the progress of such construction, the plaintiff, on April 1, 1893, made another similar contract of sale, with building privileges, with the Handbacks for the other seven lots, Nos. 57 to 63, both inclusive, those here in controversy; that, in this part of the transaction, he acted, as in the preceding part, both for syndicate No. 2 and syndicate No. 1; that he submitted the contract of sale, and subsequently also the names of the bondsmen and the plans and specifications, to the defendant Ross; that Ross verbally approved them all; that thereupon he had the usual papers prepared by the title company; and that, on May 13, 1893, he took these papers to the defendant Duncanson, and not finding him in his office, left the papers there for him. Thus far there seems to be no great variance between the testimony of the plaintiff and that of the defendants. But at this point the variance begins.

The plaintiff further proceeded to testify that, in December of 1892, the defendants gave directions to the plaintiff, through Mr. Duncanson, to sell no more lots with the build-

ing privileges, but that those seven lots, Nos. 57 to 63, were specially exempted from this withdrawal; that, on May 14, 1893, and repeatedly thereafter, the plaintiff had interviews with Duncanson about the closing of the transaction; that some time in July of 1893 the defendant Duncanson refused to execute the contract with the Handbacks, on the ground that the defendants did not at the time have money to advance for building purposes; and that the Handbacks were then, and had always been, ready, able and willing to execute the contract, on their part, and were desirous to do so.

On the other hand, the testimony on behalf of the defendants tended to show that the withdrawal of lots from sale, with building privileges, in December, 1892, was without any reservation of the lots here in controversy; and that Duncanson's refusal to complete the contract with the Handbacks was not for want of funds for building purposes, but because the time for closing the sale had expired. This statement is controverted by the plaintiff.

The defendants also offered to show at the trial, by the defendant Ross testifying as a witness, that the Handbacks were financially embarrassed, and were in fact insolvent at the time; and that he (Ross) for that reason would not have approved of a sale of these lots to them, with building privileges, even if the arrangement continued for selling with building privileges. But the trial court excluded this testimony; and the exclusion is assigned as error.

Instructions to the jury, seven in number, were requested on behalf of the defendants; and three assignments of error are here made upon the rulings of the trial court in regard to them. Two of these have reference to the application of the statute of limitations; and one to the terms of the contract made by the plaintiff with the Handbacks on April 1, 1893.

The verdict and judgment having been for the plaintiff for the whole amount claimed by him ($687.09), the defendants have brought the cause here by appeal.

*Mr. Andrew B. Duvall* for the appellants:

1. Appellee's accounts were "accounts stated;" as soon as an account becomes stated it ceases to be a mutual account, and the balance becomes immediately subject to the operation of the statute as an original and independent demand. *Spring* v. *Gray*, 6 Pet. 167; *Mand- Webber* v. *Tevill*, 2 Saund. 124, 127, note *a*; *Williams* v. *Griffiths*, 2 Cr., M. & R. 45; *Cottam* v. *Partridge*, 4 M. & G. 271; *Waller* v. *Lacy*, 1 M. & G. 54. And this is a question for the court and not the jury. *Toland* v. *Sprague*, 12 Pet. 300.

Mutual accounts are made up of matters of set-off, or, in other words, are accounts between parties who have a mutual and alternate course of dealings, under an implied agreement that one account may and shall be off-set against the other *pro tanto*. 2 Wood Limitations, 715, 716.

If this was an account between a tradesman and his customer, and the items in his account were all on one side, some charged within the statutory period, but the others earlier, the former would not entitle appellee to give evidence of the latter. *Cotes* v. *Harris*, Bull. N. P. 149; *Hallock* v. *Loose*, 1 Sandf. 220; *Guichard* v. *Superville*, 11 Tex. 522; *Judd* v. *Sampson*, 13 Id. 19.

In a continuous account, a payment made within the statutory time and not appropriated will be presumed to be made on account of the items not barred, so as not to defeat the bar as to the others. For mere payments upon account, for which credit is given, do not make the accounts mutual so as to prevent the limitation from attaching. *Webster* v. *Byrnes*, 32 Md. 86; *Adams* v. *Carroll*, 85 Pa. St. 209.

To make such accounts mutual they should be open and current and show a reciprocity of dealing. Mere payments on account made by one party for which credit is given by the other will not constitute mutual accounts. *Ingraham* v. *Sherred*, 17 Sarg. & R. 347. Part payment of a debt, there being no presumption that it was paid on account of the

debt, will not take the claim out of the statute. *United States* v. *Wilder,* 13 Wall. 254. See, also, *Coster* v. *Murray,* 5 Johns. Ch. 522; *Murray* v. *Coster,* 20 Johns. 576.

The question in this jurisdiction is a new one, and is now presented for decision for the first time. Under like conditions, the Court of Appeals of Maryland considered the question, and on principle and authority held: "That although there are open and mutual accounts between the parties, the fact that one item in the account was within three years, did not withdraw the whole account from the operation of the statute." *Sprogle* v. *Allen,* 38 Md. 331. In several of the States the same doctrine is established. *Blair* v. *Drew,* 6. N. H. 235; *Levernore* v. *Rand,* 26 Idem, 85; *Lansdale* v. *Brashear,* 37 B. Mon. 330; *Craighead* v. *Bank,* 15 Tenn. 399; *Fox* v. *Fisk,* 7 Miss. 346; *Low* v. *Dowbarn,* 26 Tex. 507.

*Mr. Clarence A. Brandenburg* for the appellee:

The accounts in this case were mutual, and this being so, the statute of limitations runs against such an account from the date of the last item. *Webster* v. *Byrnes,* 32 Md. 86; *Green* v. *Disbrow,* 79 N. Y. 1; *Gunn* v. *Gunn,* 74 Ga. 555. The reason is that the debt which a party seeks to recover is the balance only after offsetting the items on one side against those of the other.

Mr. Justice MORRIS delivered the opinion of the Court:

1. The first assignment of error, based upon the exclusion by the trial court of the testimony of the defendant Samuel Ross in regard to the alleged insolvency of the Handbacks, is clearly untenable.

While it is entirely true that contracts may often be rescinded or avoided on the ground of the insolvency or financial embarrassment of one or more of the parties to them, yet the contract in question here is plainly not of such a character as to justify the application to it of any

such rule of rescission. This contract required no payment of money by the Handbacks. The money for building was to be advanced by the defendants; and their solvency was important, not the solvency of the Handbacks. These latter were required to give a satisfactory bond and execute a deed of trust; and they did or were ready to do both. Nothing more was required of them. It does not appear how their solvency or insolvency was relevant to the matter. Moreover, it does not appear that any such objection was raised at the time, or at any time before the trial; and it seems too late to raise it then.

2. The fifth and sixth instructions requested by the defendants to be given to the jury, and upon the refusal of which the fourth assignment of error is based, were substantially to the effect that upon the evidence the plaintiff was not entitled to recover anything with reference to lots Nos. 57 to 63, inclusive. But plainly there was enough in the case to justify the submission of this question to the jury; and the court in its charge properly and fairly submitted it. In fact, this assignment of error, although made in the brief, seems to be abandoned in the argument; for no part of the argument seems to be addressed to it. We regard it, in any event, as untenable.

3. The substantial question in the case is the application of the statute of limitations to the matter of controversy.

It is quite clear to us, both upon reason and upon authority, that the account in this case is not such a mutual account or account current between the parties as in its entirety to take it out of the operation of the statute. It is not, of course, an account stated between the parties, because there was no acceptance of it or acquiescence in it by the defendants; and nothing can be called a mutual account which has not items on both sides. It might well be held that down to the 16th of March, 1893, the date of the payment of $300.50 by Duncanson to the plaintiff, the account was a mutual account. Duncanson, by his payments, may be held to have admitted

it, and to have agreed to pay the balance then due to the plaintiff, upon the face of the account. But that agreement became barred by limitation before the institution of this suit; and it was not competent for the plaintiff to remove or obviate that bar by entering items subsequent thereto on his own side of the account. It would wholly destroy the operation of the statute in all cases, if a plaintiff were allowed, by the addition of some new and independent item on his own side of an account, to give new life to an account otherwise barred by the statute of limitations. It might be competent for the person to be charged so to do; but certainly it would not be competent for the plaintiff or person who makes the charge. Since the case of *Bell* v. *Morrison*, 1 Pet. 351, we must regard it as well settled law that the mere giving of credit by one party to another is not an admission of unsettled account, so as to charge the party to whom the credit is given with the whole account. See *Sprogle* v. *Allen*, 38 Md. 331; *Murray* v. *Coster*, 20 Johns. 576; *United States* v. *Wilder*, 13 Wall. 254; 2 Wood on Limitations, p. 715.

We think, therefore, that the items in the plaintiff's account which are contained in what we have designated as the first and second parts, were barred by the statute of limitations at the time of the institution of this suit, and that the trial court should have so ruled.

With reference, however, to the subsequent items, those that concern the sale of lot 116 and the transaction with the Handbacks, we think that the ruling of the trial court was correct. The sale to Jeremiah Fickling and the sale to syndicate No. 2 were plainly not genuine sales, and were not so regarded by any of the parties. The *bona fide* sales, upon which, if at all, the plaintiff became entitled to his commissions, were those subsequently consummated or effected. Undoubtedly the plaintiff did not become entitled, in view of the course of dealing of the parties, until the defendants had in their possession, or under their control, money, the result of sale, from which commissions were to be paid; or

until, as is claimed to have occurred in the Handback case, the defendants, by their action, prevented the consummation of the contract upon which the plaintiff would have become entitled.   If the plaintiff had demanded commissions before the happening of the contingencies indicated, the defendants might well have defended themselves on the ground that the contingencies had not occurred upon the happening of which their liability would have become fixed.

The trial court, therefore, in reference to these two transactions, ruled correctly that if the jury should find the facts to be as claimed by the plaintiff, the statute of limitations would not apply to them.   And as the jury found for the plaintiff upon the facts, there seems to be no reason to disturb their verdict on account of the rulings of the court upon the law.

But for the error heretofore noted, by which the application of the statute of limitations to the previous portion of the plaintiff's account was denied, the judgment rendered in the cause must be either reversed or modified.   As it is easy, however, to separate that portion of the judgment which is erroneous from that portion which is unobjectionable, it is in the interest of justice that the judgment, instead of being reversed and a new trial ordered, at cost and expense to both parties, should be modified, which may be done if the plaintiff will undertake and agree to remit therefrom the sum of $161.98, the amount of the items to which we have held the statute of limitations to be applicable.   We understand the appellee, both in his brief and in his oral argument, to offer to make this remission in the event of our holding the statute of limitations to be applicable to this amount.

Accordingly, upon the appellee's filing in this court and in the court below within fifteen days a formal remission of the said sum of $161.98, on the judgment rendered in the cause, such judgment will be affirmed.   The costs of the appeal will be divided equally between the parties.   *And it is so ordered.*